# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| ROGER SCOTT DESMARAIS, ) | |
| ) | No. 2:15-cv-00634-DCN |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| SCIENTIFIC RESEARCH ) | **ORDER** |
| CORPORATION, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on defendant Scientific Research Corporation's ("SRC") motion for summary judgment. For the reasons set forth below, the court grants SRC's motion.

## I.  BACKGROUND

SRC is a foreign corporation organized under the laws of Delaware and operating in Charleston, South Carolina. Compl. ¶ 2. SRC is under a contract with Space and Naval Water Systems Command ("SPAWAR") to provide aviation technical services in Antarctica. Def.'s Mot. Ex. A, Lloyd Depo. 9:16-10:18. SRC hired plaintiff Roger Desmarais ("Roger") as an Air Traffic Controller in February 2002. Compl. ¶ 6. Beginning in 2003, Roger managed an air traffic control tower in McMurdo Station, Antarctica. Id. ¶ 7. As the manager, Roger was responsible for the security, safety, and overall operations of the air traffic control tower. Id. ¶ 9.

Under SRC's contract with SPAWAR, SRC also provided weather observers who were located in the air traffic control tower with the air traffic controllers. In the Spring of 2011, Roger complained to SRC's Program Manager James Lloyd ("Lloyd") that the

1

weather observers' presence in the control tower violated FAA regulation 7210.3 and USN (80T) because the observers distracted the air traffic controllers.  Compl. ¶ 12; Lloyd Depo. 20:22-21:9.  Specifically, Roger alleges that the weather observers would make telephone calls, play loud music and video games, and occasionally come to work intoxicated.  Compl. ¶ 18.  Roger claims that he continuously made complaints throughout his employment, but SRC claims that Roger first made complaints in the Spring of 2011.  In July 2011, SRC employees and government officials met to discuss the location of the weather observers.  Def.'s Mot. Ex. B, Roger Depo. 71:9-12; 80:6-19.  After the meeting, everyone understood that the weather observers would be moved to the ground floor of the air traffic control tower.  Roger Depo. 80:6-23.  However, the government had final decision-making power.  Roger Depo. 80:20-24.

In August 2011, Roger arrived in Antarctica to begin the season and moved the weather observers' equipment to the lower level of the tower.  Roger Depo. 84:15-85:17.  Additional government personnel arrived in Antarctica in October 2011.  On October 11, 2011, Jeremy Clark ("Clark"), SPAWAR Office of Polar Program's Air Traffic Manager and overall Site Lead, notified Roger that SPAWAR did not authorize the weather observers to be moved to the lower level and that they would have to be relocated to the tower cab.  Roger Depo. 86:5-87:9.  In response, Roger told Clark that he would "not work[] under weather regulations."  Roger Depo. 87:6-10.  Roger then had a discussion with Lloyd, during which Roger reiterated that he would not work under weather regulations.  Roger Depo. 90:21-91:22.  Roger and Lloyd agreed that Roger would stay for a few days and try to resolve the situation.  Id.  That same day, Roger received

notification that he was being "manifested" off the ice on the next available flight. Roger arrived in Charleston a few days later.

Lloyd attended a meeting with government officials in Charleston on October 14, 2011. Government officials decided that the weather observers did not pose a safety risk in the control tower. Roger submitted a complaint to the United States Navy, arguing that the weather observers' presence in the air traffic control tower violated federal law. Def.'s Mot. Ex. E. John Gampel ("Gampel"), Interim Inspector General of the Department of Defense, notified Roger by letter dated February 23, 2012 that "[a]ll parties agreed neither the Weather Observer nor the Air Traffic Controller should or would be distracted from proper performance of his/her duties as long as the other acts in a professional manner." Def.'s Mot. Ex. F. The letter further stated that "it was determined the facilities are appropriate and Federal requirements for Air Traffic Controllers are satisfied." Id.

Roger filed the present action against SRC on October 14, 2014, and SRC removed the case to this court on February 11, 2015. Roger brings a single cause of action for wrongful discharge in violation of public policy. Compl. ¶¶ 25-29. SRC filed the present motion for summary judgment on July 22, 2015. Roger filed a response on August 10, 2015, and SRC filed a reply on August 20, 2015. The motion has been fully briefed and is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### III.  DISCUSSION

SRC argues that the court should grant its motion for summary judgment because: (1) SRC did not terminate Roger but rather he resigned; (2) even if the court finds that SRC did terminate Roger, the termination was not in retaliation of his complaints; (3)

4

Roger has failed to establish that his termination violated a clear mandate of public policy; and (4) Roger has an existing statutory remedy. Because the court finds, as fully set forth below, that there is no clear mandate of public policy to support Roger's claim, it is unnecessary to address SRC's remaining arguments.

Under South Carolina law, absent the creation of a specific contract of employment, employment is presumed to be at-will. Mathis v. Brown & Brown of S.C., Inc., 698 S.E.2d 773, 778 (S.C. 2010). Roger is an at-will employee. An at-will employee may generally be terminated at any time for any reason or for no reason, with or without cause. Id. However, South Carolina recognizes a public policy exception to the employment at-will doctrine. See Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 216 (S.C. 1985). "Where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." Id. at 216. The South Carolina Supreme Court has expressly recognized at least two situations in which an action for wrongful discharge in violation of public policy can be maintained: (1) when an employer requires an employee to violate a criminal law as a condition of maintaining employment, see id. at 214–216, and (2) when the act of terminating an employee is itself in violation of a criminal law, see Culler v. Blue Ridge Elec. Coop., Inc., 422 S.E.2d 91, 92–93 (S.C. 1992). In Culler, the South Carolina Supreme Court stated that the public policy exception is not necessarily limited to situations involving violations of a criminal statute, but rather applies to any "violation of a clear mandate of public policy." 422 S.E.2d at 92.

South Carolina courts have been careful to narrowly interpret the exception, often declining to extend the exception beyond the bounds of Ludwick and Culler. See, e.g.,

Epps v. Clarendon Cty., 405 S.E.2d 386, 387 (S.C. 1991) (declining to extend the exception "where . . . the employee has an existing remedy for a discharge which allegedly violates rights other than the right to employment itself"); Antley v. Shepherd, 532 S.E.2d 294, 299 (S.C. Ct. App. 2000) (declining to extend the exception to situations where the employee was terminated for refusing to do something he believed would, but did not in fact, violate the law); Miller v. Fairfield Communities, Inc., 382 S.E.2d 16, 19 (S.C. Ct. App. 1989) (declining to extend the exception to situations where the employee was terminated for refusal to act in a manner that would result in civil sanctions). "The primary source of the declaration of public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration." Barron v. Labor Finders of S.C., 713 S.E.2d 634, 638 (S.C. 2011) (quoting Citizens' Bank v. Heyward, 133 S.E. 709, 713 (S.C. 1925)); see also Greene v. Quest Diagnostics Clinical Labs., Inc., No. 2:05-cv-0811, 2006 WL 2864102, at *8 (D.S.C. June 19, 2006) ("[T]he South Carolina Supreme Court has only been willing to recognize as a public policy 'mandate' something tantamount to a judicial or legislative declaration of public policy."). The South Carolina Supreme Court has held that "for purposes of juridical application it may be regarded as well settled that a state has no public policy, properly cognizable by the courts, which is not derived or derivable by clear implication from the established law of the state, as found in its Constitution, statutes, and judicial decisions." Batchelor v. Am. Health Ins. Co., 107 S.E.2d 36, 38 (S.C. 1959).

It is reasonable to require public policy to be expressed by the General Assembly or the judiciary. Without such a requirement, "any employee could circumvent the employment at-will doctrine by merely asserting a termination was retaliatory in

violation of a clear mandate of public policy and contend it was a novel issue in this state." McNeil, 743 S.E.2d at 847.  Indeed, if a plaintiff could maintain a cause of action for violation of public policy by simply alleging that a retaliatory termination violated South Carolina's public policy, there would be a substantial risk that the public policy exception would swallow the general rule allowing an employer to terminate an at-will employee at any time and for any reason.

As the United States Supreme Court has recognized, "public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection." Patton v. United States, 281 U.S. 276, 306 (1930), abrogated by Williams v. Florida, 399 U.S. 78 (1970).  The determination of what constitutes public policy is a question of law for the courts to decide.  Barron, 713 S.E.2d at 638.  The South Carolina Supreme Court recently stated that it "exercise[es] restraint when undertaking the amorphous inquiry of what constitutes public policy." Taghivand v. Rite Aid Corp., 768 S.E.2d 385, 387 (S.C. 2015).

Because Roger has not alleged that he was required to violate a criminal law or that his termination itself was in violation of a criminal law, he must establish that his termination constitutes a violation of a clear mandate of public policy.   First and foremost, the court finds that Roger failed to sufficiently state a source of a clear mandate of public policy.  Other courts in this district have held that a plaintiff's failure to identify the source of a clear mandate of public policy warrants dismissal.  See, e.g., Riley v. S. Care, Inc., No. 3:13-cv-00357, 2013 WL 1809788, at *6 (D.S.C. Apr. 29, 2013) ("Plaintiff does not direct the court to any other source of a clear mandate of public

7

policy.  Under these circumstances, the court finds that Plaintiff's claim for wrongful termination in violation of public policy fails as a matter of law."); Washington v. Perdue Farms, Inc., No. 4:07-cv-3552, 2009 WL 386926, at *12 (D.S.C. Feb. 13, 2009) ("The Plaintiff did not cite any case law to support her theory that 'requesting to see the doctor' is a public policy of South Carolina."); Smalley v. Fast Fare, Inc., No. 8:88-cv-2185-3, 1988 WL 220237, at *2 (D.S.C. Dec. 22, 1988) ("[I]n the absence of an appropriate declaration by the South Carolina courts or the General Assembly, the Plaintiff has failed to establish any public policy of South Carolina allegedly violated by the Defendant."). Rogers did not point to any law or other source that constitutes a clear mandate of public policy supporting the rights of employees to internally complain about alleged violations of FAA regulations.  Therefore, it is entirely unclear on what clear mandate of public policy his claim rests.

      In his complaint, Roger alleges that "the unjust wrongful discharge and termination of Plaintiff's employment with the Defendant was the response of the Defendant, their agents and servants, to Plaintiff's continuing complaints regarding Defendants' illegal actions and violations of state law."  Compl. ¶ 26.  Roger further alleges that "the aforesaid conduct of the Defendant, their agents and servants, violates South Carolina and United States laws against retaliatory dismissal and was, in fact, retaliatory in nature."  Id. ¶ 27.  Roger argues that the presence of the weather observers in the air traffic control tower violated Federal Aviation Authority Regulation 7210.3 and USN (80T).  However, it is unclear what the regulations prohibit because neither party provided the court a copy of the regulations.

In his complaint filed with the Navy, Roger attached "NAVAIR 00-80T-114" paragraph 3.6 which states that "[t]o guard against the unnecessary distraction by unescorted visitors and observers in ATCFs and ATC equipment spaces, commanding officers shall ensure that the security of such area is maintained."[1]  Def.'s Mot. Ex. E, 9. There is no indication that this regulation is a criminal law or that a violation would subject the violator to a criminal penalty or fine.  The general public policy considerations underlying this "statute" do not give rise to a clear mandate of public policy under South Carolina law.  Indeed, the Interim Inspector General conducted an investigation and determined that the presence of the weather observers in the control tower did not violate a federal regulation or law.  Def.'s Mot. Ex. F.

Moreover, South Carolina courts refuse to extend the public policy exception to the at-will employment doctrine to situations in which there is a good faith belief that the employer required the employee to violate the law.  Antley v. Shepherd, 532 S.E.2d 294, 298 (S.C. Ct. App. 2000) aff'd as modified, 564 S.E.2d 116 (S.C. 2002) ("We decline to extend the public policy exception to situations where an employee is terminated for refusing to comply with a directive which she simply believes would require her to violate the law.").  Therefore, even if Roger had a good faith belief that SRC and SPAWAR's policy of keeping the weather observers in the air traffic control tower caused him to violate the law, his termination does not create a claim for wrongful discharge in violation of public policy.

---

[1] Roger did not attach FAA 7210.3 to his complaint with the Navy or the present action.

Further, courts in this district, recognizing <u>Antley</u>, have held that there is no clear mandate of public policy supporting wrongful termination in violation of public policy claims of employees who report the alleged illegal conduct of their coworkers. In <u>Greene v. Quest Diagnostics Clinical Labs., Inc.</u>, 455 F. Supp. 2d 483, 490 (D.S.C. 2006), this court addressed whether to extend the recognized bounds of the public policy exception to situations in which an employee internally reports alleged illegal conduct to their superiors. The court found that the plaintiff failed to point to "any law or other source that constitutes a clear public policy supporting the rights of employees to internally report potentially illegal conduct to their superiors." <u>Id.</u> Therefore, the court held that the plaintiff's claim did not fall within the recognized bounds of the public policy exception and declined to extend the exception's current limits, granting the defendant's motion for summary judgment. <u>Id.</u> at 491. Thus, to the extent Roger bases his claim on his continued complaints regarding the allegedly illegal conduct of his employer and coworkers, his claim fails as a matter of law.

Therefore, given South Carolina's adherence to the at-will employment doctrine, the court holds that Roger's claim does not fall within the recognized bounds of the public policy exception to at-will employment and declines to extend the exception's current limits to the circumstances before the court as a matter of law. <u>See</u> <u>Taghivand</u>, 768 S.E.2d at 389 ("[T]he public policy of this state finds expression in our longstanding adherence to at-will employment; any exception to this doctrine, which is itself firmly rooted in the public policy of this state, should emanate from the General Assembly, and from this Court only when the legislature has not spoken. Absent a more clear and articulable definition of policy from the General Assembly regarding those who report

suspected crimes, we refuse to broaden the exception to the at-will employment doctrine today.").

## IV.  CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is **GRANTED**.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 3, 2015**
**Charleston, South Carolina**